FILED

2020 Oct-08  PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

SIMPLE HELIX, LLC,                       )
                                         )
          Plaintiff,                     )
                                         )
     vs.                                 )          Case No. 5:20-cv-00453-HNJ
                                         )
RELUS TECHNOLOGIES, LLC, and             )
WELLS FARGO BANK, N.A.,                  )
                                         )
          Defendants.                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Simple Helix, LLC filed a Complaint in the Circuit Court of Madison County, Alabama, alleging the following claims:  (1) open account against Relus Technologies, LLC; (2) account stated against Relus Technologies, LLC; (3) money paid by mistake against Relus Technologies, LLC; (4) conversion against Relus Technologies, LLC; (5) conversion against Wells Fargo, N.A.; (6) money had and received against Relus Technologies, LLC; (7) money had and received against Wells Fargo, N.A.; (8); breach of contract against Relus Technologies, LLC; and (9) violation of Alabama Code § 7-4A-207 against Wells Fargo, N.A.  (Doc. 1-1).

On April 1, 2020, Wells Fargo, N.A. ("Wells Fargo") removed the case to this court based upon diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), and Relus

Technologies, LLC ("Relus") consented to the removal.  (Doc. 1).[1]  This memorandum opinion addresses Wells Fargo's and Relus's Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docs. 3 & 14).

Simple Helix's claims stem from alleged conduct by its former corporate officer to steer company funds to his personal bank account.  Although the court sympathizes with Simple Helix's loss due to the alleged deceitful conduct by its former officer, it cannot transmit that loss to Wells Fargo and Relus based upon governing legal principles.  Therefore, Simple Helix fails to state viable claims against Wells Fargo and Relus, and accordingly, the court grants Wells Fargo's and Relus's Motions to Dismiss.[2]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint if it fails to state a claim for which relief may be granted.  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court revisited the applicable standard governing Rule 12(b)(6) motions to dismiss.  First, courts must take note of the elements a plaintiff must plead to state the applicable claims at issue.  *Id.* at 675.

---

[1] Simple Helix, LLC is a citizen of Alabama; Wells Fargo is a citizen of South Dakota; and Relus is a citizen of Georgia.  (Doc. 1, ¶¶ 9–11).  Thus, complete diversity of citizenship exists.  Simple Helix, LLC's Complaint demanded $501,207 in compensatory damages, as well as an unspecified sum in damages "no less than $1,000,000."  (Doc. 1-1, ¶ 70).  Therefore, the amount in controversy exceeds $75,000.

[2] The parties consented to the exercise of plenary jurisdiction by a United States Magistrate Judge. (Doc. 24).

After establishing the elements of the claim at issue, the court identifies all well-pleaded, non-conclusory factual allegations in the complaint and assumes their veracity. *Id.* at 679.   Well-pleaded factual allegations do not encompass mere "labels and conclusions," legal conclusions, conclusory statements, or formulaic recitations and threadbare recitals of the elements of a cause of action.   *Id.* at 678 (citations omitted). In evaluating the sufficiency of a plaintiff's pleadings, the court may draw reasonable inferences in plaintiff's favor.   *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

Third, a court assesses the complaint's well-pleaded allegations to determine if they state a plausible cause of action based upon the identified claim's elements. *Iqbal*, 556 U.S. at 678.  Plausibility ensues "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and the analysis involves a context-specific task requiring a court "to draw on its judicial experience and common sense."   *Id.* at 678, 679 (citations omitted).  The plausibility standard does not equate to a "probability requirement," yet it requires more than a "mere possibility of misconduct" or factual statements that are "merely consistent with a defendant's liability."   *Id.* at 678, 679 (citations omitted).

## ALLEGATIONS OF SIMPLE HELIX'S COMPLAINT AND OTHER RELEVANT BACKGROUND

Simple Helix operates a data center providing web hosting and managed information technology ("IT") services.  (Doc. 1-1 ¶ 6).  Simple Helix purchased or

leased hardware from Relus, which, in relevant part, provides IT and cloud services. (*Id.* ¶ 7).  Simple Helix and Relus "conducted business with each other for many years." (*Id.* ¶ 6).  Steve Shickles served as the Chief Executive Officer ("CEO") of Simple Helix during the relevant time period.  (*Id.* ¶ 8).

On or about May 26, 2017, Shickles initiated a $656,358 wire transfer from Simple Helix's FirstBank account to Relus's bank account.  (*Id.* ¶ 12).  The $656,358 transfer represented a $501,207 overpayment to Relus, as Simple Helix owed Relus only $155,151 for materials, supplies, and services.  (*Id.* ¶ 39).

On May 31, 2017, Shickles emailed Relus employee Brian Eith from the fictitious email account "belinda.finley@simplehelix.com"[3] to request a refund of the $501,207 overpayment.  (*Id.* ¶ 13, 14).  Impersonating Finley, Shickles wrote:

> Mr. Eith,
>
> Hello, Mr. Shickles asked me to email the wiring instructions for the refund on the wire from his FirstBank Account.
>
> Please wire the $501,207.00 to the following account:
>
> Routing: 062000080
> Acct: [XXX]
>
> Wells Fargo Bank
> 2754 Carl T Jones Dr Se
> Huntsville, AL 35802

---

[3] According to the Complaint, Belinda Finley provided Simple Helix accounting services at the time of the overpayment; though, she was not a Simple Helix employee.  (Doc. 1-1 ¶ 13).  Finley neither created nor used the email address "belinda.finley@simplehelix.com."  (*Id.*)

Once the wire has been sent, please send me confirmation so I can track it.

Thanks,
Belinda

(Doc. 16-1 at 2).[4]  The account number Shickles provided corresponds to his personal bank account at Wells Fargo.  (Doc. 1-1 ¶ 14).

Eith forwarded Shickles's email to Relus's Chief Operating Officer ("COO") Scott Luce and confirmed the $501,207 overpayment as "correct."  (Doc. 16-1 at 2). Eith further stated:  "The rest [$155,151] will cover the Ciena/Juniper order."  (*Id.*) Thereafter, Luce replied to Shickles:

Hi Belinda,
Please confirm:
Simple Helix wants the original wire from FirstBank ($656,358) that was sent to Relus partially refunded in the amount of ($501,207) sent to [a] Wells Fargo account.

(*Id.* at 1).

Shickles either instructed his administrative assistant Victoria Schulze to use her email account, "victoria.schulze@simplehelix.com", or himself used Schulze's email account, to reply to Luce:  "That is confirmed."  (*Id.*)  The confirmation email sent from

---

[4] Relus appended to its Motion to Dismiss copies of Shickles's May 31, 2017, email and the ensuing reply chain.  A court may consider documents filed in conjunction with a motion to dismiss without converting the motion to a summary judgment motion if those documents are central to the complaint and not in dispute.  *See Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).  Simple Helix's Complaint refers to the emails comprising the May 31, 2017, email chain, and Simple Helix does not dispute the copies thereof Relus appended to its Motion.  Thus, the court will consider the contents of the email chain.

Schulze's account copied Shickles via his Simple Helix email account, "steve@simplehelix.com." (*Id.*) Thereafter, Relus initiated a $501,207 wire transfer via a payment order bearing Simple Helix's name and Shickles's personal Wells Fargo bank account number. (Doc. 1-1 ¶ 17–18). Notwithstanding the discrepancy in the payment order's named beneficiary (Simple Helix) and account number (Shickles's), Wells Fargo accepted the wire transfer by crediting Shickles's account with $501,207. (*Id.* ¶ 19). Simple Helix alleges Wells Fargo knew the payment order portrayed a discrepancy and knew the funds were intended for Simple Helix. (*Id.* ¶ 20).

In March 2019, Simple Helix demanded Relus refund the $501,207 overpayment. (*Id.* ¶ 22). To date, Relus has refused to pay Simple Helix the $501,207, and has not demanded Wells Fargo reverse the $501,207 wire transfer to Shickles's account. (*Id.* ¶ 23). Simple Helix seeks to recover not only the $501,207, but also "$1,000,000 in additional losses" because "Shickles was able to continue to deceive and steal from Simple Helix for another 18 months."[5] (*Id.* ¶ 26). Simple Helix asserts various claims against Wells Fargo and Relus to recover these sums.

Simple Helix first[6] alleges Wells Fargo violated Alabama Code § 7-4A-207 by

---

[5] In the Complaint, Simple Helix states it filed a lawsuit against Shickles in January 2019, after which Shickles initiated a bankruptcy proceeding. (Doc. 1-1 ¶ 10). Simple Helix alleges the bankruptcy proceeding resulted in "a $13 million judgment against [Shickles] and in favor of Simple Helix . . . related to allegations that he embezzled, stole, converted, or otherwise misappropriated money from Simple Helix." (*Id.* ¶ 11).

[6] The court enumerates Simple Helix's claims in an order consistent with the logical resolution of the instant motions, rather than the order presented in the Complaint.

crediting Shickles's account with $501,207, despite knowing the payment order portrayed a discrepancy and knowing the funds were intended for Simple Helix. (*Id.* at 16–17 (Count 9)).

Second, Simple Helix alleges Wells Fargo converted the $501,207 by crediting Shickles's bank account with this sum, despite knowing the payment order portrayed a discrepancy and knowing the funds were intended for Simple Helix. (*Id.* at 13–14 (Count 5)).

Third, Simple Helix alleges Relus converted the $501,207 by refusing to refund Simple Helix this sum. (*Id.* at 12–13 (Count 4)).

Fourth, Simple Helix alleges Relus owes it "at least" $501,207 in money paid by mistake. Simple Helix alleges it owed Relus $155,151 for materials, supplies, and services it purchased from Relus. Simple Helix therefore contends it wired an additional $501,207 to Relus's bank account by mistake, which Relus refuses to refund. (*Id.* at 11–12 (Count 3)).

Fifth, Simple Helix alleges Relus owes it $501,207 in money had and received, as Relus received Shickles's $656,358 wire transfer representing a $501,207 overpayment and refuses to refund the overpayment. (*Id.* at 14–15 (Count 6)).

Sixth, Simple Helix alleges Wells Fargo owes it $501,207 in money had and received, as Wells Fargo received Relus's $501,207 wire transfer bearing Simple Helix's name. (*Id.* at 15–16 (Count 7)).

Seventh, Simple Helix alleges Relus owes it $501,207 on an open account. Simple

Helix contends it "maintained an account with Relus in which [it] purchased materials, supplies, and services", and Relus does not dispute Simple Helix overpaid Relus $501,207 for its purchases.  Thus, Simple Helix maintains, Relus owes Simple Helix $501,207 on the account.  (*Id.* at 10–11 (Count 1)).

Eighth, Simple Helix alleges Relus owes it $501,207 on an account stated.  Simple Helix again contends it maintained an open account with Relus, and Relus acknowledged Simple Helix overpaid Relus $501,207.  (*Id.* at 11 (Count 2)).

Ninth, Simple Helix alleges Relus breached its contract with Simple Helix by retaining the $501,207.  Simple Helix alleges it overpaid Relus $501.207 for supplies, materials, and services, and "Relus never provided any additional materials, supplies[,] or services that would entitle Relus to retain any portion of the $501,207.00 overpayment."  (*Id.* at 16 (Count 8)).

To recount, Simple Helix seeks at least $1,501,207 in damages as relief for its claims.  (*Id.* at 17).

# DISCUSSION

## I.   SIMPLE HELIX LACKS "STANDING" TO ASSERT A CLAIM AGAINST WELLS FARGO PURSUANT TO ALABAMA CODE § 7-4A-207[7]

Simple Helix alleges Wells Fargo violated Alabama Code § 7-4A-207 by accepting the $501,207 payment order bearing Simple Helix's name and Shickles's account number. It contends Simple Helix and Shickles were both "known to Wells Fargo." (Doc. 1-1 ¶ 67). Simple Helix further avers Wells Fargo knew the $501,207 was "intended for Simple Helix." (*Id.* ¶ 20). In addition, Simple Helix alleges that pursuant to "§ 7-4A-207, and . . . [Wells Fargo's] internal policies and procedures, Wells Fargo was obligated not to accept the [$501,207] intended for Simple Helix for deposit into Shickles['s] account." (*Id.* ¶ 68). The court finds Simple Helix lacks standing to assert a claim against Wells Fargo pursuant to § 7-4A-207.

Title 7 of the Alabama Code, which codifies Article 4A of the Uniform

---

[7] As the United Supreme Court advises, the concept "statutory standing," which Wells Fargo invokes, constitutes a "misleading" label because the inquiry does not implicate this court's "subject matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Rather, Wells Fargo's entreaty queries whether Simple Helix "falls within the class of plaintiffs whom [Alabama] has authorized to sue under" Alabama Code § 7-4A-207, that is, whether Simple Helix "has a cause of action under the statute." *Id.* at 128. The issue requires the court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127 (citations omitted). As delineated, the inquiry whether a plaintiff's claim constitutes a valid cause of action within a statute's confines represents a "merits issue," not a jurisdictional issue. *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 319 (D.C. Cir. 2015) (citation & internal quotation marks omitted).

Nevertheless, the court will retain the reference to "statutory standing" as this diversity case involves an interpretation of an Alabama statute, although the applicable principles do no warrant a distinct consideration.

Commercial Code, "defines the rights and obligations that arise from [funds] transfers."

U.C.C. Art. 4A prefatory note; *see* Ala. Code § 7-4A-101 *et seq.*; U.C.C. § 4A-101 *et seq.*

The following illustration depicts the mechanics of the funds transfer at issue here:

> X, a debtor, wants to pay an obligation owed to Y. Instead of delivering to Y a negotiable instrument such as a check or some other writing such as a credit card slip that enables Y to obtain payment from a bank, X transmits an instruction to X's bank to credit a sum of money to the bank account of Y. X's bank and Y's bank are different banks. X's bank may carry out X's instruction by instructing Y's bank to credit Y's account in the amount that X requested. The instruction that X issues to its bank is a "payment order." . . . When X's bank issues an instruction to Y's bank to carry out X's payment order, X's bank "executes" X's order. The instruction of X's bank to Y's bank is also a payment order. . . . The entire series of transactions by which X pays Y is know[n] as the "funds transfer."

U.C.C. Art. 4A. prefatory note.[8]

Article 4A employs particular nomenclature to delineate the rights and obligations of the parties to a funds transfer. The debtor initiating the transfer – X in the afore-cited example, or Relus here – constitutes the "originator." *Id.*; § 7-4A-104(c). The bank to which the originator sends its payment order – X's bank as depicted above, or Relus's bank here[9] – constitutes the "originator's bank." U.C.C. Art. 4A prefatory note; § 7-4A-104(d). The payee of the payment order – Y in the foregoing example, or Shickles here – constitutes the "beneficiary." U.C.C. Art. 4A prefatory note; § 7-4A-

---

[8] As the Prefatory Note to U.C.C. Article 4A clarifies, "X pays Y by causing Y's bank to become indebted to Y in the amount of the payment. This debt arises when Y's bank accepts the payment order that X's bank issued to Y's bank to execute X's order." U.C.C. Art. 4A prefatory note.

[9] The parties' filings do not identify Relus's bank by name.

103(a)(2).   The bank receiving the originator's bank's instruction to credit the beneficiary's account – Y's bank as illustrated above, or Wells Fargo here – constitutes the "beneficiary's bank."  U.C.C. Art. 4A prefatory note; § 7-4A-103(a)(3).

As relevant here, § 7-4A-207 describes the rights and obligations arising when a payment order "identifies the beneficiary both by name and by a[] . . . bank account number[,] and the name and number identify different persons."  § 7-4A-207(b).  The rights and obligations set forth in § 7-4A-207 vary depending upon the beneficiary's bank's knowledge[10] that a payment order misdescribes the beneficiary.  Specifically, as elaborated in the following discussion, a beneficiary's bank's knowledge of an identifier discrepancy may affect the beneficiary's bank's "acceptance" of the payment order.  *See* § 7-4A-207(b)(2).  The beneficiary bank's "acceptance" of a payment order, in turn, triggers certain rights and obligations vis-à-vis the funds represented therein.

To recount, Simple Helix grounds its § 7-4A-207 claim upon allegations that

---

[10] The term "knowledge", or "knows", denotes "actual knowledge."  § 7-4A-207 cmt. 2; § 7-1-202(b). In addition,

> knowledge . . . received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event, from the time when it would have been brought to the individual's attention if the organization had exercised due diligence.  An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines.  Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information.

§ 7-1-202(f).

Wells Fargo knew the payment order portrayed a discrepant account number; knew the $501,207 sum was intended for Simple Helix; but nevertheless paid Shickles. Wells Fargo contends Simple Helix lacks standing to assert a cause of action against it pursuant to § 7-4A-207. Wells Fargo further argues Simple Helix's allegations do not portray "any facts to establish or demonstrate Wells Fargo had 'actual knowledge[]' of the name/number discrepancy." (Doc. 3 at 10). In counterpoise, Simple Helix avers it may properly press a § 7-4A-207 claim against Wells Fargo because it constitutes the "intended beneficiary" of the funds transfer. (Doc. 23 at 9). Simple Helix further contends it need not "establish" or "demonstrate" Wells Fargo's knowledge of the identifier discrepancy at this motion to dismiss stage. (*Id.* at 8).

As Wells Fargo suggests, Simple Helix's allegations present a threshold issue concerning whether § 7-4A-207 establishes a right of action in Simple Helix's favor, Wells Fargo's alleged knowledge and conduct notwithstanding. For the reasons discussed herein, the court finds it does not. The court therefore assumes, for purposes of the instant analysis, Simple Helix's Complaint adequately alleges Wells Fargo possessed actual knowledge that Relus's payment order misdescribed the beneficiary.[11]

Section 7-4A-207(b) provides:

(1) [I]f the beneficiary's bank does not know that the name and number

---

[11] The court cannot discern whether Simple Helix alleges Wells Fargo knew the account number belonged to Shickles, or simply knew it did not belong to Simple Helix. However, because § 7-4A-207(b)(2) requires the beneficiary's bank to know only that the payment order portrays a discrepant name and account number, and because the court assumes Simple Helix adequately alleges Wells Fargo possessed such knowledge, this distinction remains immaterial to the instant assessment.

[on the payment order] refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.[12]

(2) If the beneficiary's bank . . . knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

§ 7-4A-207(b)(1)-(2).[13]

---

[12] Pursuant to this provision, if Wells Fargo did not know about the discrepancy, then Simple Helix would not be entitled to relief. *See Peter E. Shapiro, P.A. v. Wells Fargo Bank N.A.*, 795 F. App'x 741 (11th Cir. 2019) (the plaintiff could not maintain a clam against Wells Fargo pursuant to U.C.C. § 4A-207 because it failed to plausibly allege Wells Fargo possessed actual knowledge of the payment order's beneficiary discrepancy); *Remtek Servs. v. Wells Fargo Bank, N.A.*, No. 19-12790 (RBK/KMW), 2020 U.S. Dist. LEXIS 7678, at *9 (D.N.J. Jan. 16, 2020) ("[B]anks are immune from liability [pursuant to U.C.C. § 4A-207(b)] if they fail to confirm that the name of the beneficiary on the payment order matches the name on the bank account identified by the provided account number, unless they have actual knowledge of the discrepancy."); *TME Enters, Inc. v. Norwest Corp.*, 22 Cal. Rptr. 3d 146, 153 (Cal. Ct. App. 2004) ("UCC [§] 4A-207[(b)] . . . provides, in effect, immunity from responsibility—a 'safe harbor'—for a beneficiary's bank that relies on the account number specified in a wire transfer order to identify the beneficiary of the order."); *Sliders Trading Co. L.L.C. v. Wells Fargo Bank NA*, No. 17-cv-04930-LB, 2017 U.S. Dist. LEXIS 211169, at *16 (N.D. Cal. Dec. 18, 2017) ("[U.C.C. § 4A-207(b)]'s immunity applies if the beneficiary's bank receiving the transfer instructions does not know that the beneficiary's name and account number refer to different persons.") (citing *TME Enters., Inc.*, 22 Cal. Rptr. 3d at 153).

[13] The latitude § 7-4A-207(b)(1) grants the beneficiary's bank promotes efficient funds transfers:

> A very large percentage of payment orders issued to the beneficiary's bank by another bank are processed by automated means using machines capable of reading orders on standard formats that identify the beneficiary by an identifying number or the number of a bank account. . . . If the beneficiary's bank has both the account number and name of the beneficiary supplied by the originator of the funds transfer, it is possible for the beneficiary's bank to determine whether the name and number refer to the same person, but if a duty to make that determination is imposed on the beneficiary's bank the benefits of automated payment are lost. . . . If payment orders can be handled on an automated basis there are substantial economies of operation and the possibility of clerical error is reduced.

§ 7-4A-207 cmt. 2.

Due to Simple Helix's allegations that Wells Fargo "knew" of the beneficiary discrepancy, Wells Fargo never "accepted" Relus's bank's payment order pursuant to § 7-4A-207(b)(2).[14]   Simple Helix alleges Wells Fargo knew[15] of the identifier discrepancy in Relus's payment order and nevertheless paid Shickles, who was not entitled to receive the $501,207 payment.  Accordingly, because Shickles retained no entitlement to the $501,207 payment, "no person has rights as beneficiary."  § 7-4A-207(b)(2).  Consequently, because the payment order lacked a beneficiary, Wells Fargo's "acceptance of the order [did not] occur."  *Id.*  Crucially, Wells Fargo's "nonacceptance" of the payment order triggered rights in favor of only the parties to the payment orders – Relus, Relus's bank, and Wells Fargo.

The beneficiary's bank's acceptance of a payment order "obliges the [originator's bank] to pay the [beneficiary's] bank the amount of the order."  § 7-4A-402(b).  Conversely, therefore, the originator's bank retains no obligation to pay the beneficiary's bank if § 7-4A-207(b)(2) forecloses the beneficiary's bank's acceptance of the payment order.  *See* §§ 7-4A-207 cmt. 2; -402 cmt. 2.  Pursuant to Article 4A's "money-back guarantee", "[i]f the sender of a payment order pays the order and was

---

[14] As depicted in the afore-cited illustration, the funds transfer comprised two payment orders: (1) Relus's instruction to its bank to effect a $501,207 payment to the beneficiary; and (2) Relus's bank's conforming instruction to Wells Fargo to pay the beneficiary $501,207.  *See* U.C.C. Art. 4A prefatory note; §§ 7-4A-209, -302(a)(1).

[15] Again, the court assumes Simple Helix's Complaint plausibly alleges Wells Fargo possessed actual knowledge of the discrepancy as defined in § 1-7-202(b) and (f).

not obliged to [do so], the bank receiving payment is obliged to refund payment to the extent the sender was not obliged to pay." § 7-4A-402(d).

Therefore, if the originator's bank sends the beneficiary's bank a payment order; the originator's bank honors the order received by the beneficiary's bank; and § 7-4A-207(b)(2) precludes the beneficiary's bank's acceptance of the order, the originator's bank may seek a refund of its payment from the beneficiary's bank. As applied here, these rules create no rights in favor of Simple Helix, as Simple Helix did not operate as the originator's bank. Rather, these rules inure to the benefit of only Relus's bank as the originator's bank.

Likewise, "[w]ith respect to a payment order issued to a[n] [originator's bank], acceptance of the order by the [originator's bank] obliges the [originator] to pay the bank the amount of the [originator's] order." § 7-4A-402(c). However, the [originator's] obligation "to pay its payment order is excused if the funds transfer is not completed by acceptance by the beneficiary's bank of a payment order instructing payment to the beneficiary of th[e] [originator's] payment order." *Id.* The money-back guarantee requires the originator's bank to refund the originator's payment if § 7-4A-402(c) excuses the obligation vis-à-vis such payment. § 7-4A-402(d).

Accordingly, if the originator sends its bank a payment order; the originator honors the order; and § 7-4A-207(b)(2) forecloses the beneficiary's bank's acceptance of the order, the originator may seek a refund of the payment from its bank. These provisions do not create any rights in favor of Simple Helix, as Simple Helix did not

operate as the originator, and, therewith, did not honor a payment order sent to Relus's

bank.  Rather, these provisions inure to only Relus's benefit as the originator.

The following hypothetical ("Doe hypothetical") illuminates the foregoing

principles:

> Doe is the holder of shares in Mutual Fund. Thief, impersonating Doe,
> requests redemption of the shares and directs Mutual Fund to wire the
> redemption proceeds to Doe's account #12345 in Beneficiary's Bank.
> Mutual Fund originates a funds transfer by issuing a payment order to
> Originator's Bank to make the payment to Doe's account #12345 in
> Beneficiary's Bank. Originator's Bank executes the order by issuing a
> conforming payment order to Beneficiary's Bank which makes payment
> to account #12345. That account is the account of [Thief] rather than
> Doe. . . .
>
> If . . . Beneficiary's Bank knew about the conflict between the name and
> number and nevertheless paid [Thief], [§ 7-4A-207](b)(2) applies. Under
> that provision, acceptance of the payment order of Originator's Bank did
> not occur because there is no beneficiary of that order. Since acceptance
> did not occur Originator's Bank is not obliged to pay Beneficiary's Bank.
> Similarly, Mutual Fund is excused from its obligation to pay Originator's
> Bank. *Thus, Beneficiary's Bank takes the loss. Its only cause of action is against Thief.*

§ 7-4A-207 cmt. 2 (emphases added) (internal citations omitted).[16]

As § 7-4A-207(b)(2) and the Doe hypothetical portray, the nonoccurrence of

acceptance constitutes the central consequence in the following circumstances: the

beneficiary's bank knowledge that a payment order displays an identifier discrepancy,

---

[16] To render the Doe hypothetical more germane to the instant case, the court omitted references to a bona fide purchaser, "Roe," appearing in the original hypothetical but not represented by any person described in Simple Helix's complaint.  The original hypothetical is based upon the facts of *Bradford Trust Co. of Boston v. Texas American Bank-Houston*, 790 F.2d 407 (5th Cir. 1986).

and the beneficiary's bank subsequent payment to a person not entitled to receive the originator's payment.  The nonoccurrence of acceptance, in turn, solely exempts the originator and the originator's bank from the duty to honor their payment orders – or entitles them to the protection of the money-back guarantee if they honored their payment orders.  Thus, § 7-4A-207 creates a right to recover only in favor of the parties to the payment orders.[17]  *See Frankel-Ross v. Congregation Ohr Hatalmud*, No. 15 Civ. 6566 (NRB), 2016 U.S. Dist. LEXIS 128342, at *6–11 (S.D.N.Y. Sept. 13, 2016) (The originator of a payment order who, induced by fraud, initiated a payment order that caused the beneficiary's bank to pay the fraudster's creditor, could not assert a cause of action against the beneficiary's bank pursuant to U.C.C. Article 4A because "the 'money back guarantee' provision . . . applies only between the parties to a particular payment order and not to the parties to the funds transfer as a whole.'") (quoting *Grain Traders v. Citibank, N.A.*, 160 F.3d 97, 101 (2d Cir. 1998)).

Here, Simple Helix was not a party to either payment order in the $501,207 funds transfer to Shickles's account.  Relus and Relus's bank comprise the parties to the first payment order.  Relus's bank and Wells Fargo comprise the parties to the second payment order.  Thus, as the afore-cited rules depict, any rights and obligations arising

---

[17] Although in the Doe hypothetical Beneficiary's Bank may assert a cause of action against Thief, § 7-4A-207 cmt. 2, Article 4A does not harbor this cause of action.  As the hypothetical asserts, for purposes of the rights and obligations arising under Article 4A, "Beneficiary's Bank takes the loss." *Id.*

under § 7-4A-207(b)(2) and its associated provisions lie exclusively with Relus, Relus's bank, and Wells Fargo.

To be sure, agency principles may vest Simple Helix with an equitable interest in the $501,207 to the extent Shickles obtained this sum with the actual, inherent, implied, or apparent authority to settle Simple Helix's accounts with Relus.[18]  *See Stone v. Mellon Mortg. Co.*, 771 So. 2d 451, 457 (Ala. 2000) ("Implied authority of an agent is authority to do whatever acts or use whatever means are reasonably necessary and proper to the accomplishment of the purposes for which the agency was created, so that in the conduct of his principal's business, an agent has implied authority to do that which the nature of the business would demand in its due and regular course.") (quoting *Merrell v. Joe Bullard Oldsmobile, Inc.*, 529 So. 2d 943, 947 (Ala. 1988)); *Northington v. Dairyland Ins. Co.*, 445 So. 2d 283, 285 (Ala. 1984) ("[T]he doctrine of apparent authority is based on the principal's holding the agent out to a third person as having the authority under which he acts.") (quoting *Auto. Acceptance Corp. v. Powell*, 234 So. 2d 593, 601 (Ala. Civ. App. 1970)); *Builders' Supply Co. v. Smith*, 222 Ala. 554, 556 (Ala. 1931) ("[I]f one in

---

[18] To recount, Shickles served as Simple Helix's CEO during the relevant time period.  Simple Helix avers it "contracted with Relus for Relus to provide materials, supplies, and services to [Simple Helix] whereby [Simple Helix] would pay the corresponding sums owed to Relus within a reasonable amount of time."  (Doc. 1-1 ¶ 39).  Further, as described previously, Relus's COO confirmed in his May 31, 2017, email that Belinda Finley – seemingly acting on behalf of Shickles – instructed Relus to refund the $501,207 into the identified Wells Fargo account.  Moreover, as elaborated below, by averring "*it* overpaid Relus by $501,207.00" for supplies, materials, and services, (doc. 1-1 ¶ 63) (emphasis added), and *it* demanded Relus refund the overpayment, (*id.* ¶ 36), Simple Helix implicitly acknowledges Shickles retained the authority to procure the $501,207 refund.

violation of his duty to another has obtained a fund to his own use, equity will impress the fund with a constructive trust.").

Yet not even Shickles, who represents merely the payee of the payment order,[19] constitutes a party to the payment order vis-a-vis the rights and obligations arising when the beneficiary's bank knows of an identifier discrepancy and pays a person not entitled to receive payment.  Thus, despite any interest Simple Helix retains in the $501,207 by virtue of its ostensible principal/agent relationship with Shickles, Simple Helix constitutes merely a third party to the payment order and to the funds transfer itself for purposes of § 7-4A-207.[20]  *See* § 7-1-201(b)(26) ("'Party', as distinguished from 'third party', means a person that has engaged in a transaction . . . subject to [Article 4A]."); *c.f. Sheerbonnet, Ltd. v. Am. Exp. Bank, Ltd.*, 951 F. Supp. 403, 413 (S.D.N.Y. 1995) ("[U]nder the terms of the payment order [the bank] is itself the beneficiary, not [the plaintiff]. What agreement existed between [the bank] and [the plaintiff] for final payment is beyond the pleadings. Thus, although in the real world [the plaintiff] was to be the 'beneficiary' of the $ 12.4 million, in the electronic world of [Article 4A] funds

---

[19] To recount, pursuant to § 7-4A-207(b)(2), the payment order lacks a beneficiary because Shickles was not entitled to Relus's $501,207 payment.  Thus, although Shickles received Relus's $501,207 payment, he cannot be considered the "beneficiary" of the payment order.

[20] Simple Helix refers to itself as the "bona fide intended beneficiary [of the $501,207 funds transfer] under the UCC." (Doc. 23 at 10).  Significantly, however, the term "intended beneficiary" does not appear in Article 4A and Article 4A's nomenclature does not define an actor in Simple Helix's position. As depicted in the foregoing discussion, Article 4A contemplates the existence of the originator, originator's bank, beneficiary's bank, and beneficiary.  Therefore, Simple Helix properly constitutes a third party to the funds transfer, rather than an intended beneficiary thereof.  *See* § 7-1-201(b)(26).

transfers it was [the bank] . . . .") (internal citation omitted).

Crucially, therefore, while § 7-4A-207 and its associated provisions expressly create rights in favor of the parties to the payment orders comprising a funds transfer, they remain silent as to the rights of a third party to a miscarried funds transfer. *See Koss Corp. v. Am. Express Co.*, 309 P.3d 898, 906 (Ariz. 2013) ("A review of [U.C.C.] Article 4A demonstrates that it carefully and comprehensively governs the rights and responsibilities between *the originator and the originator's bank* . . . involved in payment orders, as well as between *a beneficiary's bank and the beneficiary.* . . . [T]he actions of the *parties involved in a funds transfer* that implicate the transaction itself are exclusively governed by Article 4A.") (emphases added) (internal citations omitted). This silence forecloses Simple Helix's claim against Wells Fargo. *See Banco de La Provincia de Buenos Aires v. Baybank Bos. N.A.*, 985 F. Supp. 364, 371 (S.D.N.Y. 1997) (Where the beneficiary of a payment order intended to use the transferred funds to repay amounts owed to the beneficiary's bank, but neither the beneficiary nor the beneficiary's bank received the funds, the court "found no precedent allowing the intended beneficiary of a funds transfer [the beneficiary's bank] to recover from a receiving bank."); *ADS Assocs. Grp., Inc. v. Oritani Sav. Bank*, 99 A.3d 345, 354–57 (N.J. 2014) (the plaintiff could not assert a cause of action against the defendant pursuant to U.C.C. Article 4A because he did not constitute a "customer" in whose favor Article 4A creates a right of action); *c.f. Regions Bank v. Legal Outsource PA*, 936 F.3d 1184 (11th Cir. 2019) (A third-party guarantor lacked standing to assert claims pursuant to the Equal Credit Opportunity

Act because the Act created a right of action only in "applicants."); *Austin & Laurato, P.A. v. United States*, 539 F. App'x 957, 963 (11th Cir. 2013) (The plaintiffs lacked standing to assert a cause of action pursuant to a federal tax statute remaining "silent on third party claimants.").

The absence of any U.C.C. rights in favor of a third party such as Simple Helix accords with Article 4A's stated purpose. *See Siegelman v. Ala. Ass'n of Sch. Bds.*, 819 So. 2d 568, 579 (Ala. 2001) ("The intent of the Legislature is the polestar of statutory construction."). "In the drafting of [Article 4A's] rules, a critical consideration was that *the various parties to funds transfers* need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately." § 7-4A-102 cmt. Naturally, a third party not *actually participating* in a funds transfer retains no interest in modifying its behavior in view of the rights and obligations Article 4A sets forth, even if that third party suffers an injury from an Article 4A funds transfer. *See* 3 WHITE, SUMMERS, & HILLMAN, UNIFORM COMMERCIAL CODE § 22:9 (6th ed. 2019) ("[T]he drafters . . . create[d] unique rules for funds transfers in an attempt to create a high degree of specificity when determining the responsibilities and resulting liabilities of the parties involved in these transactions. This is especially important in allowing *funds transfer participants* accurately to predict the risk of conducting these large dollar value transactions before they happen.") (emphasis added).

Consistent with these principles, therefore, neither § 7-4A-207 nor any other Article 4A provision creates relevant rights in favor of a third party not occupying the

role of the originator, originator's bank, beneficiary's bank, or beneficiary.[21] Accordingly, irrespective of its allegations that Wells Fargo knew the payment order portrayed an identifier discrepancy and nevertheless paid Shickles, the court concludes Simple Helix lacks standing to assert a cause of action against Wells Fargo pursuant to § 7-4A-207.[22]

Pursuant to the foregoing discussion, the court grants Wells Fargo's motion to dismiss Simple Helix's § 7-4A-207 claim.

---

[21] Article 4A creates certain rights in favor of a "customer", which constitutes "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders." § 7-4A-105(a)(3); *see* § 7-4A-204.  However, because Simple Helix does not represent a "customer" for purposes of the instant claim, these rights remain irrelevant.  *See Frankel-Ross v. Congregation Ohr Hatalmud*, No. 15 Civ. 6566 (NRB), 2016 U.S. Dist. LEXIS 128342, at *6–11 (S.D.N.Y. Sept. 13, 2016); *ADS Assocs. Grp., Inc. v. Oritani Sav. Bank*, 99 A.3d 345, 354–57 (N.J. 2014); *Banco de La Provincia de Buenos Aires v. Baybank Bos. N.A.*, 985 F. Supp. 364, 371 (S.D.N.Y. 1997).

[22] Simple Helix does not plausibly allege that § 4-207(b)(2) "obligated [Wells Fargo] not to accept the [$501,207] intended for Simple Helix", (doc. 1-1 ¶ 68), or required Wells Fargo "to take the appropriate and necessary actions to ascertain why the intended beneficiary of the [$501,207] wire transfer – Simple Helix – did not match Wells Fargo's known records and information regarding Shickles or Simple Helix."  (*Id.* ¶ 21).  As reflected in the foregoing discussion, although Article 4A does not insulate the beneficiary's bank from liability when it knows the payment order portrays an identifier discrepancy and nonetheless pays a person not entitled to payment, any liability arising in such circumstances does not impose upon the beneficiary's bank a duty in favor of a *third party* to refuse to accept or otherwise investigate a payment order misdescribing the beneficiary.

Simple Helix likewise falters in its allegation that Wells Fargo's "internal policies and procedures" obligated it to refuse the $501,207 payment order.  (*Id.* ¶ 68).  To the extent Wells Fargo owed Simple Helix a duty vis-à-vis the $501,207 payment order, Article 4A does not create or govern this duty. Article 4A describes certain duties arising when "a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure."  § 7-4A-202(a).  But because Simple Helix does not constitute Wells Fargo's customer, the duties arising from this provision remain irrelevant.  As elaborated in the foregoing discussion, Article 4A creates no rights in favor of Simple Helix.

## II.   SIMPLE HELIX DOES NOT ALLEGE A PLAUSIBLE CONVERSION CLAIM AGAINST WELLS FARGO

Simple Helix alleges Wells Fargo converted $501,207 by crediting Shickles's account with this sum despite the identifier discrepancy in Relus's payment order. Simple Helix further alleges "Wells Fargo accepted a wire transfer for funds it knew were intended for Simple Helix and transferred them to an account held [by] Shickles." (Doc. 1-1 ¶ 20).   Wells Fargo counters that Article 4A preempts, and therefore precludes, Simple Helix's conversion claim.   Contrary to Wells Fargo's contention, the court finds Article 4A does not preempt Simple Helix's claim.   However, the court concludes Simple Helix nevertheless fails to allege a plausible conversion claim against Wells Fargo.

### A.   Article 4A Does Not Preempt Simple Helix's Conversion Claim Against Wells Fargo

Wells Fargo correctly highlights that "Article 4A is 'intended to be the *exclusive means* of determining the rights, duties, and liabilities of the affected parties in any situation covered by particular provisions of the article."   (Doc. 4 at 12) (quoting § 7-4A-102 cmt.) (emphasis in original).   Thus, although "principles of law and equity . . . supplement [Article 4A]", § 7-1-103(b), "resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this article." § 7-4A-102 cmt.   Nevertheless, "Article 4A is not the 'exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer.'"   *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274–75 (11ᵗʰ Cir.

2003) (quoting *Sheerbonnet, Ltd.*, 951 F. Supp. at 409).

Pursuant to the foregoing principles, a plaintiff may assert a common law claim based upon a funds transfer if the claim (1) arises from circumstances not contemplated in Article 4A; or (2) represents rights and obligations not contrary to those set forth in Article 4A.   *See Wright v. Citizen's Bank of E. Tenn.*, 640 F. App'x 401, 406 (6th Cir. 2016) ("[U.C.C.] Article 4A displaces common-law claims relating to wire transfers if the claims arise out of a situation addressed by Article 4A or attempt to create rights, duties, or liabilities inconsistent with Article 4A."); *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89–90 (2d Cir. 2010) ("For [U.C.C.] Article 4A purposes, the critical inquiry is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim."); *Koss*, 309 P.3d at 906 ("[T]he U.C.C. does not necessarily preempt claims based on additional actions that occur outside the funds transfer process or exceed the allocation of liability under Article 4A provided the application of other law is not inconsistent with Article 4A."); *Zengen, Inc. v. Comerica Bank*, 158 P.3d 800, 808 (Cal. 2007) ("[C]ommon law causes of action based on allegedly unauthorized funds transfers are preempted in two specific areas: (1) where the common law claims would create rights, duties, or liabilities inconsistent with [U.C.C. Article 4A]; and (2) where the circumstances giving rise to the common law claims are specifically covered by the provisions of [U.C.C. Article 4A]."); *Fitts v. AmSouth Bank*, 917 So. 2d 818, 824 (Ala. 2005) ("[I]f the situation made the basis of a dispute is addressed in Article 4A, then the provisions of Article 4A provide the exclusive rights

24

and remedies of the parties involved."); 3 WHITE, SUMMERS, & HILLMAN, *supra* ("Only issues covered by the provisions of Article 4A or claims that would create inconsistent rights, duties, or liabilities are preempted.").

Simple Helix's conversion claim neither arises from circumstances fully contemplated in Article 4A nor contravenes the rights and duties delineated therein. To recount, Simple Helix alleges that Wells Fargo not only paid Shickles knowing the payment order depicted Simple Helix's name and a non-corresponding account number, but also that Wells Fargo *knew Relus intended to pay Simple Helix* via the $501,207 payment order.[23]  Article 4A lacks any provisions addressing this situation.

To be sure, as elaborated previously, § 7-4A-207(b)(2) describes the rights and obligations arising when the beneficiary's bank knows the payment order portrays an account number not corresponding to the named beneficiary, and pays a person not entitled to receive payment from the originator.  However, the beneficiary's bank's payment to a person not entitled to receive the originator's payment differs from the beneficiary's bank's payment to a person it *knows* is not entitled to receive the originator's payment.[24]  The Eleventh Circuit illuminated an analogous distinction in

---

[23] As afore-stated, it remains unclear whether Simple Helix alleges Wells Fargo knew the payment order portrayed Simple Helix's name and Shickles's account number, or alleges, instead, that Wells Fargo knew the payment order portrayed Simple Helix's name and an account number simply not belonging to Simple Helix.  For purposes of the instant analysis, however, the operative allegation constitutes Simple Helix's allegation Wells Fargo knew the $501,207 was intended for Simple Helix – irrespective of Wells Fargo's knowledge that the account number belonged to Shickles.  This ambiguity thus remains immaterial.

[24] Suppose, for example, Simple Helix merely alleged Wells Fargo knew the payment order portrayed

*Regions Bank v. Provident Bank.*

*Regions Bank* involved a series of U.C.C. Article 4A funds transfers in which the beneficiary's bank accepted payment orders to effectuate the transfer of funds obtained by fraud.  Provident Bank ("Provident") agreed to loan Morningstar Mortgage Bankers ("Morningstar") money, which Morningstar agreed to use to furnish mortgage loans to home buyers.  *Regions Bank*, 345 F.3d at 1270.  After Provident discovered Morningstar was under investigation for fraud, Provident demanded Morningstar to promptly repay its outstanding loans.  *Id.* at 1271.  Morningstar represented that it would wire the repayments into its account at Provident, as "Morningstar had previously reimbursed Provident from monies deposited in this account."  *Id.*

Around the same time, Morningstar entered into a loan agreement with Regions Bank.  *Id.*  Pursuant to the loan agreement, Regions Bank wired funds to an attorney escrow account at Fleet Bank, which would finance mortgage loans for particular home buyers.  *Id.*  After Fleet Bank credited the escrow account with the funds, Morningstar represented to the attorney that Regions Bank transferred the funds in error, and that Morningstar was the intended payee of the funds.  *Id.*  Upon Morningstar's request, the

---

Simple Helix's name and Shickles's account number (or an account number that did not belong to Simple Helix), and nevertheless paid Shickles, who was not entitled to Relus's $501,207 payment. Standing alone, these allegations engender the possibility that Wells Fargo could have relied upon the account number in the payment order to pay Shickles – and, therewith, paid a person not entitled to payment – without knowing that Simple Helix was entitled to the payment.  That is, Wells Fargo could have paid the person not entitled to payment (Shickles) without knowing the status of the person actually entitled to payment (Simple Helix) – and those circumstances fall squarely within § 7-4A-207(b)(2).

attorney originated a wire transfer whereby Fleet Bank wired the funds to Morningstar's account at Provident.  *Id.*  Similarly, Morningstar itself fraudulently instructed Fleet Bank to wire certain funds in the attorney escrow account to Morningstar's account at Provident.  *Id.* at 1272.  Provident then applied the fraudulently obtained funds to Morningstar's outstanding debt.  *Id.*

After Provident refused to return the funds, Regions Bank asserted claims against Provident for conversion and unjust enrichment, among other state and federal law claims.  *Id.* at 1273.  Provident contended Article 4A preempted the state law claims, as the claims arose from Article 4A funds transfers governed exclusively by Article 4A's provisions.  The district court agreed with Provident; however, the Eleventh Circuit rejected the district court's finding that Article 4A preempted Regions Bank's claims.

The Court opined that Article 4A permits a beneficiary's bank to accept funds using the procedures Provident employed to accept the funds for Morningstar.  *Id.* at 1275.  Furthermore, Article 4A permits the beneficiary's bank to obtain recompense from funds credited to the beneficiary's account, as Provident did vis-à-vis the funds transferred to Morningstar's account.  *Id.*  Nevertheless, "Article 4A is silent with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known that the funds were fraudulently obtained."  *Id.*  The Court further emphasized that pursuant to U.C.C. § 1-304, Article 4A imposes upon the beneficiary's bank an obligation of good faith in the performance of its duties.  *Id.* at 1275–76.

Accordingly, the Court reasoned, "a provision of state law that requires a

receiving or beneficiary bank to disgorge funds that it knew or should have known were obtained illegally when it accepted a wire transfer is not inconsistent with the goals or provisions of Article 4A." *Id.* As the Court observed, "[i]nterpreting Article 4A in a manner that would allow a beneficiary bank to accept funds when it knows or should know that they were fraudulently obtained, would allow banks to use Article 4A as a shield for fraudulent activity. It could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A." *Id.* at 1276. The same reasoning applies here.

First, like the allegations depicted in *Regions Bank*, Simple Helix's allegations transcend the boundaries of Article 4A. As discussed previously, neither § 7-4A-207(b)(2) nor any other Article 4A provision contemplates the rights and liabilities arising when the beneficiary's bank knows a payment order misdescribes the beneficiary and knowingly pays a person not entitled to the originator's payment.[25] Furthermore, as highlighted in *Regions Bank*, the beneficiary's bank retains a duty of good faith in accepting payment orders. *See* § 7-1-304. The duty of good faith requires "honesty in fact." § 7-1-201(20).

Although Simple Helix does not allege Wells Fargo participated in Shickles's fraud, its allegation that Wells Fargo accepted the $501,207 despite knowing the funds

---

[25] Indeed, Professors Robert S. Summers, Robert A. Hillman, and James J. White observe that in an Article 4A funds transfer, it "is implausible that a bank would 'knowingly' make a large payment into a thief's account." 3 WHITE, SUMMERS, & HILLMAN, UNIFORM COMMERCIAL CODE § 24:6 (6th ed. 2019).

were intended for Simple Helix may nevertheless incite the duty of good faith.  Applying the reasoning of *Regions Bank*, the court does not interpret Article 4A as permitting the beneficiary's bank to knowingly pay a person not entitled to payment "so long as it complied with the provisions of Article 4A."  *Regions Bank*, 345 F.3d at 1276.

Accordingly, because Article 4A does not address the circumstances forming the basis of Simple Helix's allegations against Wells Fargo, Simple Helix's conversion claim does not "create rights, duties, and liabilities inconsistent with those stated in [Article 4A]."  § 7-4A-102 cmt.  Furthermore, the instant conversion claim does not contravene Article 4A because, as discussed previously, neither § 7-4A-207(b)(2) nor any other relevant Article 4A provision provides a right of action in favor of a third party to a funds transfer who does not constitute the originator, originator's bank, beneficiary's bank, or beneficiary.

Thus, the instant conversion claim does not attempt to confer upon Simple Helix a right which Article 4A precludes or otherwise prescribes.  Nor does it impose upon Wells Fargo a liability which Article 4A defines or against which Article 4A shields.[26]

---

[26] Article 4A's intended focal point forecloses the possibility that by remaining silent as to the beneficiary's bank's obligations to a third party, the drafters intended to insulate the beneficiary's bank from any such liability.  As elaborated previously, the drafters crafted Article 4A to define the rights of the parties to the funds transfer.  *See* § 7-4A-102 cmt.  Sensibly, therefore, Article 4A does not contemplate – expressly or silently – the beneficiary bank's liability to a nonparty such as Simple Helix.

Furthermore, given the "particularization and detail" with which Article 4A describes the rights of the parties to a funds transfer, *Iselin v. United States*, 270 U.S. 245, 250 (1926), Article 4A's silence on third-party rights does not constitute a proscription against the same.  *C.f. Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 185 (1994) ("[I]t is not plausible to interpret the statutory silence as tantamount to an implicit congressional intent to impose [15 U.S.C. § 78j(b)] aiding and abetting

*See Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 626 (8th Cir.

2014) (The defendant-bank's claim for attorney fees did not create rights inconsistent

with Article 4A because Article 4A does not address attorney fees, and, "[a]lthough

awarding attorney's fees to a bank under an indemnification agreement might reduce a

customer's overall recovery against that bank, it would do so for reasons extrinsic to

Article 4A's attempts to balance the risk of loss due to a fraudulent payment order.");

*c.f. Ma*, 597 F.3d at 90 ("[W]e are bound to recognize the rights and duties [U.C.C.

Article 4A] provides for precisely the[] circumstances [plaintiff alleges].   As a result,

resort to Article 4A and its statute of repose is unavoidable."); *ReAmerica, S.A. v. Wells

Fargo Bank Int'l*, No. 04 Civ. 5233 (DAB), 2008 U.S. Dist. LEXIS 30614, at *22–23

(S.D.N.Y. Mar. 18, 2008) ("[Plaintiff] cannot raise a common law negligence claim two

years after the date of alleged injury and thereby create a right wholly inconsistent with

the stated one year statute of repose imposed by Article 4A."), *aff'd*, 577 F.3d 102 (2d

Cir. 2009); *Sheerbonnet*, 951 F. Supp. at 414 ("[Plaintiff's] common law claims, based in

tort and equity, do not conflict with any of [U.C.C. Article 4A's] provisions. In fact, in

---

liability."); *Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1257 (11th Cir. 2014) ("Sarbanes-Oxley's fee
provision states that '[a]n employee prevailing in any action under [the statute] shall be entitled to all
relief necessary to make the employee whole,' including 'reasonable attorney fees.'  The statute is silent
as to whether similar relief is available for employers who successfully defend against an employee's
Sarbanes-Oxley claim. We see no reason to construe this statutory silence as an implicit prohibition
against awarding attorneys' fees to employers.") (alteration in original) (internal citation omitted);
*TranSouth Fin. Corp. v. Johnson*, 931 F.2d 1505, 1507 n.3 (11th Cir. 1991) ([11 U.S.C. §] 523 is silent as to
whether creditors may be entitled to attorney's fees as a consequence of prevailing in such an action.
This statutory silence does not preclude a contractual award of attorney's fees to a creditor successful
in a dischargeability proceeding; it merely does not provide a separate *statutory* basis for such an
award.") (emphasis in original).

the context of the circumstances giving rise to them, these claims compliment primary policy goals of the Article, including consistency, predictability, finality, and the fair allocation of risk."). Therefore, because Simple Helix's conversion claim does not disturb or evade the allocation of loss set forth in Article 4A, the court concludes Article 4A does not preempt Simple Helix's conversion claim against Wells Fargo.

### B.  Simple Helix Fails to Plausibly Allege a Conversion Claim Against Wells Fargo

Alabama law establishes that conversion requires "proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property."  *Covington v. Exxon Co.*, 551 So.2d 935 (Ala. 1989); *Gillis v. Benefit Tr. Life Ins. Co.*, 601 So. 2d 951 (Ala. 1992); *Gray v. Liberty Nat'l Life Ins. Co.*, 623 So. 2d 1156 (Ala. 1993).  The elements of conversion "'include a wrongful taking of specific property and an assumption of ownership or dominion over the separate and identifiable property of another . . . . Further, the plaintiff must have a right to immediate possession of such property and the taking must be in defiance of that right.'"  *McGee v. McGee*, 91 So. 3d 659, 667 (Ala. 2012) (quoting *Young v. Norfolk S. Ry.*, 705 So. 2d 444, 446 (Ala. Civ. App. 1997)).  In the matter at bar, the primary issue involves whether the $501,207 Wells Fargo allegedly owes Simple Helix constitutes "specific and identifiable property" for the purposes of conversion.

Where there exists an obligation to deliver uniquely specific mintage or keep it intact, one may pursue a conversion claim against a transgressor who breaches the obligation. 54 AM. JUR. 2D *Money* § 5 (1971); 89 C.J.S. *Trover and Conversion* § 23 (1955). Generally, an action for conversion of money will not lie unless "the money at issue is capable of identification." *Greene Cty. Bd. of Educ. v. Bailey*, 586 So. 2d 893, 898 (Ala. 1991). As the Alabama Supreme Court discussed in *Gray v. Liberty National Life Insurance Co.*:

> An action alleging conversion of cash lies only where the money involved is "earmarked" or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum.

623 So. 2d at 1160.

However, the Alabama Supreme Court recognizes that our economic system's evolution engenders conversion claims where an individual can successfully trace money to identified or segregated sources or accounts. *Lewis v. Fowler*, 479 So. 2d 725, 727 (Ala. 1985). "The money need not be specific bills or notes squirrelled away in paper bags . . . to be sufficiently identified," *Estate of Jackson v. Phillips Petroleum Co.*, 676 F. Supp. 1142, 1147 (S.D. Ala. 1987), and funds in an escrow account reside "segregated enough to qualify as specific and identifiable." *Willingham v. United Ins. Co. of Am.*, 628 So. 2d 328, 333 (Ala. 1993).

Therefore, money must remain specifically sequestered or emanate from a specifically identified source to sustain an action for conversion; concomitantly, an obligation to deliver a specific sum does not satisfy this standard. *Compare Johnson v. Life Ins. Co. of Ala.*, 581 So. 2d 438 (Ala. 1991) (holding that insurance premiums paid were not specific enough for an action of conversion), *with Gray*, 623 So. 2d at 1156 (Ala. 1993) (holding that money paid on pre-authorized checks defendant drew monthly against plaintiff's bank account constituted "identifiable" money).

In further illustration, the Alabama Supreme Court declined to extend the definition of "specific money capable of identification" to funds an employer garnished from an employee's wages. *Lewis v. Fowler*, 479 So. 2d 725, 727 (Ala. 1985). Although the employer owed the employee a certain sum of money, there existed "no obligation to return the identical money, but only a *relationship of debtor or creditor*." *Lewis*, 479 So. 2d at 727 (emphasis added). As the Court understood, employees treasure the amount of their wages, not particular coins or bills, money in a bag or chest, or payment into a special account. *Id.*; *see also SouthTrust Bank v. Donely*, 925 So. 2d 934, 938 (Ala. 2005) (citing *Knox v. Moskins Stores, Inc.*, 2 So. 2d 449 (Ala. 1941)).

The Court extended its analysis in *Covington v. Exxon Co.*, 551 So. 2d 935 (Ala. 1989), holding that mineral lease royalties commingled in one account did not comprise specific funds so as to sustain a conversion action. 551 So. 2d at 939. Even though individual bookkeeping accounts tracked the amounts owed each lessor, the

commingling of royalties in pooled accounts rendered the "specific money [in]capable of identification" for the purpose of conversion. *Id.*

The Alabama Supreme Court's analysis in *Crown Life Ins. Co. v. Smith*, 657 So. 2d 821 (Ala. 1995) remains likewise illustrative. In *Crown Life*, the defendant insurance agent forged plaintiffs' signatures onto premium checks owed to the plaintiffs and deposited the checks into his corporation's checking account. The Court affirmed the trial court's ruling that plaintiffs could maintain their conversion claim because the refund checks constituted "specific, identifiable property that represented funds owed from [the defendant] to the [plaintiffs.]" *Crown Life*, 657 So. 2d at 823. Because the defendant wrongfully exercised dominion over the checks through his forgeries and retained the funds, the court deemed those checks converted. Furthermore, "the funds available under each policy were specifically identified by the policy number and could have been easily retrieved for the [plaintiffs] under the policy number." *Id.* at 824.

Applying the foregoing precedent and authority, Simple Helix cannot sustain its conversion claim against Wells Fargo. As properly discerned in *Crown Life*, Simple Helix treasures the $501,207 Wells Fargo allegedly owes, not any specific check on which Wells Fargo may render the payment. Simple Helix's allegations thus improperly attempt to transform an alleged debtor-creditor relationship into a conversion cause of action. *Lewis*, 479 So. 2d at 727; *Russell v. Praetorians, Inc.*, 248 Ala. 576, 580 (Ala. 1947) (The plaintiff could not maintain a claim for the conversion of money because she merely sought payment of a debt; thus, the money did not constitute "specific money

capable of identification."). Further, unlike the defendant in *Crown Life*, Wells Fargo did not purloin funds from Simple Helix and appropriate them for its own use. *See Donely*, 925 So. 2d at 942 (pursuant to *Crown Life*, the plaintiff could not maintain a conversion claim against a bank when the bank did not appropriate the plaintiff's certificates of deposit, but simply refused to pay the plaintiff funds represented therein).

In addition, by alleging Wells Fargo wrongfully credited Shickles's personal account with $501,207, Simple Helix fails to plausibly allege the $501,207 remains sequestered from the remainder of Shickles's account or resides in any special account. *See Covington*, 551 So. 2d at 939; *Lewis*, 479 So. 2d at 727; *Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co.*, 875 So. 2d 1143, 1164 (Ala. 2003) (The plaintiff could maintain its claim for the conversion of money based upon the existence of "a separate Target Funds account designated for [the policyholders] from which [the plaintiff's administrative] charges were paid."); *Campbell v. Naman's Catering, Inc.*, 842 So. 2d 654, 660 (Ala. 2002) (The plaintiff could not sustain a claim for the conversion of money because "the money forming the basis for [the] conversion claim was [not] held in any sort of special account.").

Pursuant to the foregoing discussion, Simple Helix's allegations fail to plausibly demonstrate Wells Fargo converted specific money capable of identification. Accordingly, the court grants Wells Fargo's motion to dismiss Simple Helix's conversion claim.

## III.   SIMPLE   HELIX   DOES   NOT   ALLEGE   A   PLAUSIBLE CONVERSION CLAIM AGAINST RELUS

Simple Helix alleges Relus converted $501,207 after Shickles transferred $656,358 to Relus's account, thereby furnishing Relus a $501,207 overpayment, and Relus refused to refund Simple Helix the $501,207 overpayment.   Simple Helix's allegations falter for the reasons discussed in the preceding section.

As elaborated previously, an action for the conversion of money generally will not lie unless the money is specific and capable of identification.   *See Bailey*, 586 So. 2d at 898.   Therefore, money must remain specifically sequestered or emanate from a specifically identified source to sustain an action for conversion.   Crucially, an obligation to deliver a specific sum does not satisfy this standard.   *See Johnson*, 581 So. 2d at 443; *Gray*, 623 So. 2d at 1156.

Simple Helix fails to plausibly allege Relus wrongfully detained or interfered with specific money capable of identification.   As in its conversion claim against Wells Fargo, Simple Helix seeks to recover the $501,207 sum Relus allegedly owes, not any specific instrument on which Relus may render the payment.   Simple Helix alleges the $501,207 overpayment remains "readily and easily identifiable[,] and able to be segregated based on the distinct characteristics of the specific wire transfer executed by [Simple Helix] on a certain day and at a certain time . . . into Relus'[s] certain bank account."   (Doc. 1-1 ¶ 46).   Despite the particulars of the wire transfer, however, Simple Helix fails to plausibly allege the $501,207 resides in a special account reserved exclusively for this

payment or remains sequestered from other funds in Relus's account.  *See Covington*, 551 So. 2d at 939; *Lewis*, 479 So. 2d at 727; *Waddell & Reed, Inc.*, 875 So. 2d at 1164; *Campbell*, 842 So. 2d at 660; *Russell*, 248 Ala. at 580.

Furthermore, the Complaint fails to present any plausible allegations that Relus's receipt of the $501,207 overpayment constituted "a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse" of the funds.  *Ott v. Fox*, 362 So. 2d 836, 839 (Ala. 1978); *see Cassels v. Pal*, 791 So. 2d 947, 953 (Ala. 2001) ("Essential to a conversion would be some wrongful taking, wrongful retention, or misapplication of specifically identifiable personalty.").  While Simple Helix maintains "Relus never provided any additional materials, supplies or services that would entitle Relus to retain any portion of the $501,207.00 overpayment", (doc. 1-1 ¶ 63), Relus's alleged lack of any entitlement to the $501,207 overpayment does not equate to a wrongful taking or an illegal use of the same.  Indeed, as elaborated in the following discussions of Simple Helix's remaining common law claims, the Complaint portrays that Relus did not actually "retain any portion of the $501.207.00 overpayment."  (*Id.*)

In short, Simple Helix fails to plausibly allege that Relus retains an obligation to return the specific $501,207 Shickles transferred to Relus via the $656,358 funds transfer, or that Relus wrongfully took or retained this amount.  Therefore, Simple Helix does not a plausible conversion claim against Relus.  The court thus grants Relus's motion to dismiss Simple Helix's conversion claim against it.

## IV.   SIMPLE HELIX DOES NOT ALLEGE A PLAUSIBLE CLAIM FOR MONEY PAID BY MISTAKE AGAINST RELUS

Simple Helix alleges Relus owes it $501,207 in money paid by mistake because Relus received the $656,358 funds transfer "represent[ing] a mistaken overpayment to Relus by approximately $501,207.00." (Doc. 1-1 ¶ 40). Simple Helix's allegations do not state a plausible claim for money paid by mistake.

A claim of money paid by mistake essentially restates a claim for unjust enrichment. *See Dickinson v. Cosmos Broad. Co.*, 782 So. 2d 260, 266 (Ala. 2000) ("The essence of the theories of unjust enrichment or money had and received is that a plaintiff can prove facts showing that defendant *holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake or fraud.") (emphases in original) (citations omitted).

An unjust enrichment claim entails the following elements: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation. *Portofino Seaport Village, LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008); *Bocage v. Acton Corp.*, No. 2:17-cv-01201-RDP, 2018 WL 905351, at *8 (N.D. Ala. Feb. 15, 2018). "Such an action is founded upon the equitable principal that no one ought to unjustly enrich himself at the expense of another." TILLEY'S ALABAMA EQUITY § 20:2 (2020).

Simple Helix does not plausibly allege Relus owes it $501,207 in money paid by mistake because the Complaint fails to portray that Relus has been unjustly enriched by

this amount. Simple Helix alleges Relus received $501,207 via the $656,358 funds transfer Shickles initiated from Simple Helix's bank account or about May 26, 2017. (Doc. 1-1-¶ 40). However, pursuant to the allegations Simple Helix "repleads, realleges, and incorporates by reference" in support of the instant claim, (doc. 1-1- ¶ 38), Relus remitted this sum via the $501,207 funds transfer that ultimately accrued to Shickles's bank account. Relus, therefore, neither holds nor retains any benefit from the $501,207 to which Simple Helix claims an entitlement.

Simple Helix finds no refuge in its allegations it has yet to recover the $501,207, or that "Relus executed a wire transfer from its bank account to an account it knew was different from the one from which it had received Simple Helix's funds." (Doc. 1-1 ¶ 17).[27] Simple Helix's allegations portray that Relus no longer possesses the $501,207, irrespective of the miscarried funds transfer.

Thus, because a claim for money paid by mistake requires "the unjust *retention* of a benefit to the loss of another or the *retention* of money or property of another", Simple Helix's claim falters. TILLEY'S ALABAMA EQUITY § 19:1 (2020) (emphases added); *see Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986); ("Here, plaintiff's complaint affirmatively discloses that defendants do not hold any amount of

---

[27] Simple Helix does not allege Relus knew the Wells Fargo account belonged to Shickles, and nevertheless originated the $501,207 payment order bearing Simple Helix's name and Shickles's account number. Simple Helix correctly emphasizes that "neither Relus'[s] knowledge nor participation in [Shickles's] wrongdoing is an element of any of the causes of action asserted against [Relus]." (Doc. 25 at 4). Yet the afore-cited allegation merits clarification nevertheless, as allegations that Relus knew of or participated in Shickles's wrongdoing may manifest some relevance to the analyses herein.

money paid to them by mistake or otherwise. Quite the contrary, [defendant] retained only the sum of money actually owed to it by [the subcontractor], and returned the overpayment to [the subcontractor]. Obviously, then, [defendant] has not been 'unjustly enriched,' as a matter of law, by retaining any money; it does not have in its possession any money belonging to [plaintiff-general contractor].”); *RREF RB-AL SLDL, LLC v. Saxon Land Dev.*, 968 F. Supp. 2d 1133, 1141 (M.D. Ala. 2013) (“A defendant cannot be unjustly enriched if it does not have in its possession any money belonging to the plaintiff.”).

For the foregoing reasons, the court grants Relus's motion to dismiss Simple Helix's claim for money paid by mistake.

## V.   SIMPLE HELIX DOES NOT ALLEGE A PLAUSIBLE CLAIM FOR MONEY HAD AND RECEIVED AGAINST RELUS

Simple Helix alleges Relus owes it $501,207 in money had and received because Relus received $656,358 via Shickles's funds transfer, and “Relus has failed and refused to provide [Simple Helix] with a refund of the [$501,207] overpayment” represented therein. (Doc. 1-1 ¶ 55). Simple Helix's allegations do not state a plausible claim for relief for money had and received.

A claim for money had and received essentially duplicates a claim for money paid by mistake, which, as previously elaborated, restates a claim for unjust enrichment. *See Johnson v. Life Ins. Co.*, 581 So. 2d 438, 443 (Ala. 1991) (“The essence of [a claim for] money had and received is that facts can be proved which show that [the] defendant

holds money which in equity and good conscience belongs to the plaintiff or was improperly paid to the defendant because of mistake or fraud.") (alterations in original) (quoting *Foshee v. Gen. Tel. Co.*, 322 So. 2d 715, 717 (1975)); *.McPherson v. Foust*, 8 So. 193 (Ala. 1886); *Pendry v. Brundridge*, 57 Ala. 574 (1877); ALABAMA LAW OF DAMAGES § 34:2 (2020) ("[T]he plaintiff has a restitution action for money had and received wherever the defendant holds money that in equity and good conscience belongs to the plaintiff or was improperly paid to the defendant because of mistake or fraud.").

Simple Helix fails to allege Relus owes it $501,207 in money had and received for the reasons discussed vis-à-vis Simple Helix's analogous claim for money paid by mistake. As elaborated previously, Simple Helix's allegations reflect that Relus does not hold the $501,207 Shickles transferred from Simple Helix's bank account, and, therewith, has not been unjustly enriched by this amount. Accordingly, because Simple Helix fails to plausibly allege Relus has been unjustly enriched by the $501,207 payment, Simple Helix fails to state a plausible claim for relief against Relus for money had and received.

Pursuant to the foregoing analysis, the court grants Relus's motion to dismiss Simple Helix's claim for money had and received.

## VI.   SIMPLE HELIX DOES NOT ALLEGE A PLAUSIBLE CLAIM FOR MONEY HAD AND RECEIVED AGAINST WELLS FARGO

Simple Helix alleges Wells Fargo owes it $501,207 in money had and received because, "[d]espite Simple Helix being named the beneficiary of the wire transfer and despite Simple Helix being known to Wells Fargo as a prior account holder, Wells Fargo received the [$501,207] intended for Simple Helix and has failed to pay those funds to Simple Helix."  (Doc. 1-1 ¶ 60).  Simple Helix also incorporates in the instant claim its allegation that "Wells Fargo accepted a wire transfer for funds it knew were intended for Simple Helix and transferred them to an account held [by] Shickles." (*Id.* ¶¶ 20, 56). Wells Fargo contends Article 4A preempts Simple Helix's claim for money had and received.  The court finds Article 4A does not preempt the instant claim; however, Simple Helix's allegations nevertheless fail to state a plausible claim against Wells Fargo for money had and received.

### A.   Article 4A Does Not Preempt Simple Helix's Claim for Money Had and Received

As previously elaborated, Article 4A displaces only those common law claims which (1) arise from circumstances specifically contemplated in Article 4A; or (2) attempt to establish rights, duties, or liabilities inconsistent with Article 4A.  *See Wright*, 640 F. App'x at 406; *Ma*, 597 F.3d at 89–90 (2d Cir. 2010); *Koss*, 309 P.3d at 906.  For the same reasons Article 4A does not displace Simple Helix's conversion claim against Wells Fargo, it likewise does not displace the instant claim for money had and received.

The instant claim, predicated upon essentially the same allegations set forth vis-à-vis Simple Helix's conversion claim against Wells Fargo, arises from circumstances Article 4A's provisions do not address.  To recount, § 7-4A-207 describes the rights and obligations arising when a beneficiary's bank knows a payment order reflects a beneficiary discrepancy and pays a person not entitled to the originator's payment.  *See* § 7-4A-207(b)(2).  However, neither § 7-4A-207(b)(2) nor any other Article 4A provision delineates the rights and duties arising when the beneficiary's bank knows the payment order misdescribes the beneficiary and knowingly pays a person not entitled to the originator's payment.  Thus, because Article 4A does not prescribe "the duties, rights, and liabilities of the parties in the misdescription-of-beneficiary situation presented by this case," *Peter E. Shapiro, P.A. v. Wells Fargo Bank N.A.*, 795 F. App'x 741, 750 (11th Cir 2019), the instant claim does not "create rights, duties and liabilities inconsistent with [Article 4A]."  § 7-4A-102 cmt; *see Regions Bank*, 345 F.3d at 1275.  Therefore, Article 4A does not preempt Simple Helix's claim for money had and received against Wells Fargo.

Furthermore, as described previously, Article 4A remains silent as to the rights of a third party – and the beneficiary's bank's attendant liabilities to a third party – arising from the miscarried funds transfer at issue here.  Accordingly, the instant claim does not represent an attempt to create rights inconsistent with those set forth in Article 4A.  Likewise, the instant claim does not seek to impose upon Wells Fargo liability which Article 4A precludes or otherwise defines.  Article 4A, therefore, does not

preempt Simple Helix's claim for money had and received against Wells Fargo.

## B. Simple Helix Does Not Allege a Plausible Claim for Money Had and Received

However, Simple Helix nevertheless fails to plausibly allege Wells Fargo owes it $501,207 in money had and received.  As discussed previously, a claim for money had and received cannot lie absent plausible allegations the defendant retained a benefit or was unjustly enriched.  *See Johnson*, 581 So. 2d at 443.  As afore-cited, Simple Helix alleges that notwithstanding the payment order's beneficiary discrepancy, "Wells Fargo received the [$501,207] intended for Simple Helix and has failed to pay those funds to Simple Helix."  (Doc. 1-1 ¶ 60).

Crucially, however, Simple Helix's allegations portray that Wells Fargo received the $501,207 not for its benefit, but rather for that of Shickles.  According to the Complaint, Wells Fargo credited Shickles's account with the $501,207 sum pursuant to the payment order it received from Relus's bank.  *See* doc. 1-1 ¶ 19; §§ 7-4A-209, -302 (the originator's bank may execute the originator's payment order by sending a conforming payment order to the beneficiary's bank; the beneficiary's bank accepts the payment order by crediting the beneficiary's account with the appropriate amount).  Simple Helix thus does not plausibly allege Wells Fargo itself retained the $501,207.

Furthermore, notwithstanding its allegation Wells Fargo knew Relus intended to pay Simple Helix via the $501,207 funds transfer, Simple Helix fails to allege Wells

Fargo derived any benefit from crediting Shickles's account with this amount.[28] Accordingly, because Simple Helix does not plausibly allege Wells Fargo was unjustly enriched by the $501,207 funds transfer, Simple Helix does not state a plausible claim for relief against Wells Fargo for money had and received.

Pursuant to the foregoing discussion, the court grants Wells Fargo's motion to dismiss Simple Helix's claim for money had and received.

## VII.   SIMPLE HELIX DOES NOT ALLEGE A PLAUSIBLE OPEN ACCOUNT CLAIM AGAINST RELUS

Simple Helix alleges Relus owes it $501,207 on an open account because it overpaid Relus this amount for materials, supplies, and services, and Relus has refused to repay Simple Helix the same.   Simple Helix further alleges that "[s]ubsequent to making the overpayment, [Simple Helix] rendered the statement of the account to Relus in the form of an email request for a refund of the overpaid amount.   Relus acknowledged the overpayment and acknowledged owing a refund to [Simple Helix] for the overpayment."   (Doc. 1-1 ¶ 30).   Relus's alleged indebtedness to Simple Helix does not properly engender an action upon an open account.

An action upon an open account serves as "a method of proving amounts owed." *NTA Graphics S., Inc. v. Axiom Impressions, LLC*, 413 F. Supp. 3d 1164, 1180 (N.D. Ala.

---

[28] To be sure, in theory, the $501,207 credit to Shickles's account may have presented Wells Fargo an opportunity for some form of gain.   For example, banks may profit from its customers' accounts by collecting fees or financing loans thereupon.   *See* Robert DeYoung & Tara Rice, *How Do Banks Make Money? A Variety of Business Strategies*, 28 ECON. PERSP. 52 (2004).   However, the Complaint contains no allegations that Wells Fargo *actually* derived a benefit from the $501,207 credit to Shickles's account. *See Portofino Seaport Village, LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008).

2019) (citing 1A C.J.S. *Account Stated* § 2). To "establish an open account there must be an account based upon running or concurrent dealings, the dealings must not have been closed, settled or stated, and some term of the contract must remain to be settled between the parties, or the agreement must contemplate further transactions between the parties." *Rose Manor Health Care, Inc. v. Barnhardt Mfg. Co.*, 608 So. 2d 358, 360 (Ala. 1992) (citing 1 C.J.S. *Account, Action on* § 3 (1985)).

An open account may "consist of one item or many", provided "there is a term of the contract to be ascertained." *Northern A. R. Co. v. Wilson Mercantile Co.*, 63 So. 34, 36 (Ala. Civ. App. 1913). Typically, "[a] defining characteristic of an open account is that services are recurrently granted over a period of time." 1 AM. JUR. 2D. *Accounts and Accounting* § 4 (2020). In such circumstances, "an open account is similar to a line of credit." *Id.*

Here, Simple Helix does not plausibly allege Relus owes it $501,207 based upon an unsettled contract term arising from "running or concurrent dealings." *Rose Manor*, 608 So. 2d at 360. Although Simple Helix alleges it "maintained an account with Relus in which [Simple Helix] purchased materials, supplies, and services from Relus", (doc. 1-1 ¶ 28), this allegation does not plausibly aver Relus's alleged debt arises from an unascertained contract term or an agreement that "contemplate[s] further transactions between the parties." *Rose Manor*, 608 So. 2d at 360. As afore-stated, an action upon an account stated serves as a vehicle for establishing the amount of a debt, which, due to an unascertained contract term, remains unliquidated. The open account depicted

in *NTA Graphics South, Inc.* remains instructive.

There, the plaintiff rendered recurrent printing services to the defendant, and the parties agreed the defendant would pay the plaintiff for "jobs it printed." *NTA Graphics S., Inc.*, 413 F. Supp. 3d at 1170. The parties disagreed, however, as to the terms on which the defendant would pay the plaintiff. *Id.* The defendant maintained "it agreed to pay [the plaintiff] a sum no greater than the amount [the defendant] billed its customer, less paper and freight provided by [the defendant]." *Id.* The plaintiff countered that assenting to such a price term "would not make business sense." *Id.* The defendant ultimately paid the plaintiff based upon its understanding of the price term. The plaintiff claimed the defendant remained indebted for printing services rendered, and initiated an action upon an account stated to establish the amount owed.

As the foregoing facts portray, the open account in *NTA Graphics South, Inc.* properly arose from an unsettled contract term that engendered a disputed debt.[29] Here, by contrast, Simple Helix fails to allege the $501,207 sum Relus allegedly owes arises from an unascertained contract term or a contract the parties left open for future dealings. Similarly, although Relus disputes it remains liable for the $501,207 sum, the instant claim nevertheless does not attempt to ascertain a disputed, unliquidated debt

---

[29] In *NTA Graphics South, Inc.*, the defendant did not dispute the plaintiff's open account claim constituted the appropriate method of proving the amounts allegedly owed. Rather, the plaintiff filed, and, based upon the defendant's factual disputes, the court denied, a motion for summary judgment on the amounts allegedly owed. *NTA Graphics S., Inc. v. Axiom Impressions, LLC*, 413 F. Supp. 3d 1164, 1181 (N.D. Ala. 2019).

based upon an unsettled contract term.  Rather, the instant claim merely attempts to establish Relus's liability for the $501,207 overpayment.  Therefore, an action upon an open account remains an improper means to ascertain any liability Relus retains vis-à-vis the $501,207 overpayment.

For these reasons, Simple Helix fails to plausibly allege Relus owes it $501,207 on an open account.  Accordingly, the court grants Relus's motion to dismiss Simple Helix's open account claim.

## VIII.  SIMPLE HELIX DOES NOT ALLEGE PLAUSIBLE ACCOUNT STATED OR BREACH-OF-CONTRACT CLAIMS AGAINST RELUS[30]

Simple Helix alleges Relus owes it $501,207 on an account stated because it overpaid Relus this amount for materials, supplies, and services purchased "on an open account."  (Doc. 1-1 ¶ 34).  Simple Helix further alleges "Relus acknowledged the overpayment and acknowledged owing a refund to [Simple Helix] for the overpayment."  (*Id.* ¶ 36).  Nevertheless, Simple Helix maintains, "Relus has refused and failed to reimburse or refund [Simple Helix] for its credit owed and due on [the] account."

Similarly, Simple Helix alleges Relus breached a contract between the parties by failing to refund Simple Helix the $501,207 overpayment and transferring this amount

---

[30] The court will assess Simple Helix's account stated and breach-of-contract claims in the same manner because, as elaborated in the following discussion, they essentially allege the same transgression.

48

to Shickles's personal bank account.  According to Simple Helix, via the "[p]arties' conduct, actions, and course of dealing," it "contracted with Relus for Relus to provide materials, supplies and services to [Simple Helix] and [Simple Helix] would timely pay Relus the purchase price." (Doc. 1-1 ¶ 62).  However, Simple Helix maintains, "Relus never provided any additional materials, supplies or services that would entitle Relus to retain any portion of the $501,207.00 overpayment." (*Id.* ¶ 63).  Simple Helix further alleges that despite its "demands, Relus has failed to refund to [Simple Helix] the [$501,207] overpayment.  Instead, Relus transferred such monies to Shickles'[s] personal bank account." (*Id.* ¶ 64).

An account stated constitutes "an agreement between parties who have had previous monetary transactions." *Karrh v. Crawford-Sturgeon Ins., Inc.*, 468 So. 2d 175, 176 (Ala. Civ. App. 1985) (citation omitted).  Thus,

> An account stated is a post-transaction agreement. It is not founded on the original liability, but is a new agreement between parties to an original account that the statement of the account with the balance struck is correct and that the debtor will pay that amount. It is as if a promissory note had been given for the balance due.
>
> A prima facie case on an account stated is made when the plaintiff proves (1) a statement of the account between the parties is balanced and rendered to the debtor; (2) there is a meeting of the minds as to the correctness of the statement; and (3) the debtor admits liability. The debtor's admission to the correctness of the statement and to his liability thereon can be express or implied. An account rendered, and not objected to within a reasonable time becomes an account stated, and failure to object will be regarded as an admission of correctness of the account.

*Stacey v. Peed*, 142 So. 3d 529, 532 (Ala. 2013) (citations omitted).

An account stated thus properly constitutes "a new agreement between parties to an original account that the statement of the account with the balance struck is correct and that the debtor will pay that amount." *Univ. of S. Ala. v. Bracy*, 466 So. 2d 148, 150 (Ala. Civ. App. 1985) (citation omitted). Once a plaintiff proves a prima facie case of an account stated, the burden shifts to a defendant to assert any available legal defense. *Karrh*, 468 So. 2d at 176 (citation omitted). Importantly, an "account is a general term which covers an item of indebtedness, *by contract, express or implied*." *Stacey*, 142 So. 3d at 532 (citations omitted) (emphasis in original).

Relatedly, to state a viable breach-of-contract claim, Simple Helix must allege: "(1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011) (citation omitted).

Simple Helix's account stated claim and breach-of-contract claim both concern the same contract properly susceptible to the account stated paradigm: an agreement or promise by Relus to refund the $501,207 sum Simple Helix overpaid for materials, supplies, and services. Simple Helix's allegations vis-à-vis the "[p]arties' conduct, actions, and course of dealing" reference a prior monetary transaction between Simple Helix and Relus, whereas the agreement regarding the refund constitutes a post-transaction contract, that is, an account stated. Therefore, the court will analyze Simple

Helix's account stated and breach-of-contract claims concurrently pursuant to the foregoing standards.

Simple Helix's allegations portray that Relus discharged any contractual duty to furnish the $501,207 refund; thus, the Complaint fails to state plausible claims for an account stated or breach of contract.   Specifically, the Complaint establishes that Shickles, acting as Simple Helix's agent, bound Simple Helix to his May 31, 2017, refund instructions, and, therewith, bound Simple Helix to the $501,207 wire transfer he procured from Relus.

Pursuant to Alabama law, "[a]n agent's authority to contract on behalf of his principal must be either expressed, implied, or apparent." *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1203 (N.D. Ala. 2009) (quoting *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297, 304 (Ala. 1986)).   Alabama law further provides:

> [i]mplied authority may be viewed as actual authority given implicitly by the principal to the agent; and, as otherwise stated, it is actual authority circumstantially proved, or evidenced by conduct or inferred from course of dealing between the alleged principal and agent. It differs from apparent authority in that it is authority which the principal intended that the agent should have.

*Patterson v. Page Aircraft Maint., Inc.*, 283 So. 2d 433, 125–26 (Ala. Civ. App. 1973) (quoting 2A C.J.S. *Agency* § 153).   Further, an agent retains the authority to "[d]o everything necessary or proper and usual in the ordinary course of business for effecting the purpose of his agency."   Ala. Code § 8-2-4.

As for apparent authority, a "principal is bound by acts of his agent under a merely ostensible authority to those persons only who have in good faith and without want of ordinary care incurred a liability or parted with value upon the faith thereof." *Id.* § 8-2-6. In addition, a principle clothes an agent with apparent authority by "holding the potential agent out to third parties as having the authority to act." *Malmberg v. Am. Honda Motor Co.*, 644 So. 2d 888, 891 (Ala. 1994). Similarly, an agent's apparent authority is "implied where the principal passively permits the agent to appear to a third person to have the authority to act on [the principal's] behalf." *Kindred Nursing Ctrs. East, LLC v. Jones*, 201 So. 3d 1146, 1154–55 (Ala. 2016) (quoting *Carraway v. Beverly Enters. Ala., Inc.*, 978 So. 2d 27, 30 (Ala. 2007)).

Therefore, the "doctrine of apparent authority does not rest upon what one thinks an agent's authority may be, or what the agent holds out his authority to be; rather, the doctrine of apparent authority is based on the *principal's* holding the agent out to a third person as having the authority under which he acts." *Fletcher v. Lupo*, No. 2:08-CV-01844-JEO, 2011 WL 13233198, at *7 (N.D. Ala. July 5, 2011), *rept. & recommend. adopted sub nom. Major Gen. Paul Fletcher v. Lupo*, No. 2:08-CV-01844-JEO, 2011 WL 13233423 (N.D. Ala. Sept. 8, 2011) (quoting *Johnson v. Shenandoah Life Ins. Co.*, 281 So. 2d 636, 640 (Ala. 1973)) (emphasis in original). "Apparent authority rests upon what the principal, not the alleged agent, conveys to a third party." *Id.*

Consistent with these principles, therefore, "[a]n agent acts with apparent authority only when a third party's belief that the agent acts with authority is reasonable

and is traceable to a manifestation made by the principal." RESTATEMENT (THIRD) OF AGENCY § 6.11.  As the Restatement (Third) of Agency elaborates, an agent's apparent authority to act arises as "to a third person by . . . conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* § 27.

Simple Helix irrefutably establishes that Shickles possessed either implied or apparent authority to demand Relus refund the $501,207 overpayment pursuant to his May 31, 2017, instructions, and, therewith, bind Simple Helix to Relus's wire transfer. Simple Helix alleges "*it* overpaid Relus by $501,207.00", (doc. 1-1 ¶ 63) (emphasis added), and *it* "rendered the statement of the account to Relus in the form of an email request for a refund of the overpaid amount." (Doc. 1-1 ¶ 36).  Simple Helix thus imputes Shickles's overpayment and refund request to itself, and, by extension, tacitly avers that Shickles retained sufficient agency authority to contract and bind Simple Helix to these acts.  Crucially, therefore, pursuant to its own allegations, Shickles's acts and representations – including his May 31, 2017, refund instructions – are attributable to Simple Helix.  *See* RESTATEMENT (THIRD) OF AGENCY § 6.11(2) ("A representation by an agent made incident to a contract or conveyance is attributed to a disclosed or unidentified principal as if the principal made the representation directly when the agent had actual or apparent authority to make the contract or conveyance unless the third party knew or had reason to know that the representation was untrue or that the agent acted without actual authority in making it.").

However, while Simple Helix indisputably embraces Shickles's $501,207 overpayment refund agreement with Relus as its own, it nonetheless alleges that by "transferr[ing] such monies' to Shickles'[s] personal bank account", Relus breached its duty to refund the overpayment. (Doc. 1-1 ¶ 64). Yet, significantly, Relus transferred the $501,207 to Shickles's personal bank account pursuant to the email request from *Simple Helix* (via Shickles's agency authority). Simple Helix thus adopts Shickles's representations to maintain its contractual right to the refund, but disavows the same to shield itself from the legally binding effect of Relus's $501,207 wire transfer. As Relus insists, Simple Helix "cannot have it both ways." (Doc. 14-1 at 11).

By averring it "rendered the statement of the account to Relus in the form of an email request for a refund of the overpaid amount", Simple Helix binds itself not only to Shickles's refund request, but also to Relus's conforming performance. (*Id.* ¶ 36). That is, if Simple Helix – acting through Shickles – demanded Relus refund the overpayment to the Wells Fargo account, and Relus agreed to the same, then Relus fulfilled its promise to Simple Helix via its $501,207 wire transfer to the Wells Fargo account. Simple Helix thus cannot plausibly contend it formed a binding contract via Shickles's May 31, 2017, refund request and wiring instructions, yet disavow it is bound by the $501,207 wire transfer Relus furnished pursuant to such instructions.[31]

---

[31] Indeed, Shickles may have possessed the inherent authority to contract on Simple Helix's behalf. To be sure, Alabama law has long provided that corporate presidents and CEOs do not possess any inherent authority to act as agents for a corporation. *See Roberts v. Pearce Const. Co.*, 624 So. 2d 1009, 1011 (Ala. 1993) ("It is fundamental that the president of a corporation has no authority to bind the

Indeed, the equitable estoppel doctrine additionally forecloses Simple Helix's entreaty:[32]

> The purpose of the doctrine of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience.
>
> In order for the doctrine of equitable estoppel to apply, a party must demonstrate:
>
> (1) That the person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on;
>
> (2) That the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon the communication; and

---

corporation merely by virtue of his office; any such authority must come from the charter or bylaws of the corporation, or from authority delegated to him by the board of directors of the corporation.") (citing *Belcher v. Birmingham Tr. Nat'l Bank*, 348 F. Supp. 61 (N.D. Ala. 1968); *McMillan v. Dozier*, 59 So. 2d 563 (Ala. 1952)).

Nevertheless, Simple Helix's deemed Shickles a "manager" and an officer in verified complaints and affidavits in its state court case against Shickles.  Pursuant to another line of longstanding Alabama law, "[u]nless the authority of a general manager is restricted, his authority and powers are coextensive with the powers of the corporation itself, and he has the authority to do any act on its own behalf . . . in the ordinary course of the company's business."  *In re Int'l Resorts, Inc.*, 46 B.R. 405, 415–16 (N.D. Ala. 1984) (quoting *Belcher*, 348 F. Supp. at 122) (second alteration in original); *see also Anderson v. McAllister Towing & Transp. Co.*, 17 F. Supp. 2d 1280, 1289 (S.D. Ala. 1998), *aff'd sub nom. Anderson v. McAllister Towing*, 202 F.3d 287 (11th Cir. 1999) (same) (citing *Belcher*, *supra*; *W.T. Rawleigh Co. v. Phillips*, 167 So. 271, 272 (Ala. 1936) ("A general manager has broad powers and implied authority to control the affairs of the company.")).

[32] Although equitable estoppel constitutes an affirmative defense, a "complaint may be dismissed if an affirmative defense . . . appears on the face of the complaint."  *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (citation omitted); *see also Culver v. Lang*, 935 So. 2d 475, 478 (Ala. Civ. App. 2006) ("A party can obtain a dismissal [of a compliant] on the basis of an affirmative defense only when "the affirmative defense appears clearly on the face of the pleading.") (quoting *Jones v. Alfa Mut. Ins. Co.*, 875 So. 2d 1189, 1193 (Ala. 2003)).

(3) That the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct.

*Wehle v. Bradley*, 195 So. 3d 928, 939 (Ala. 2015) (internal citations, alterations, and quotation marks omitted). The equitable estoppel doctrine flows from longstanding principles of equity, particularly in this context:

> The maxim of natural justice here applies with its full force that he who, without intentional fraud, has enabled any person to do any act, which must be injurious to himself, or to another innocent party, shall himself suffer the injury, rather than the innocent party, who has placed confidence in him.

*Simpson & Harper v. Harris & Scrandrett*, 56 So. 968, 970 (Ala. 1911) (citation omitted).

The equitable estoppel defense manifests plainly on the face of Simple Helix's Complaint. First, as previously discussed, Simple Helix maintains Shickles bound it to the agreement with Relus to refund the overpayment and, therefore it yields to Shickles's May 31, 2017, refund instructions. Further, the May 31, 2017, refund request itself portrays Shickles's – and, by ascription, Simple Helix's – "intention that the [refund request] [would] be acted on." *Wehle*, 195 So. 3d at 939. Next, the Complaint depicts that by wiring the $501,207 refund to Shickles's Wells Fargo account, Relus "relie[d] upon the [refund request]" without knowledge of the misrepresentations therein.[33] *Id.* Finally, because Relus relinquished the $501,207 overpayment pursuant

---

[33] As highlighted previously, Simple Helix does not allege Relus knew of, or participated in, Shickles's misconduct. To the contrary, Relus confirmed that "Simple Helix want[ed] the original wire from FirstBank . . . partially refunded . . . to [a] Wells Fargo account." (Doc. 16-1 at 1). *See EvaBank v. Traditions Bank*, 258 So. 3d 1119, 1124 (Ala. 2018) ("It is well settled that the 'party invoking estoppel

to Simple Helix's instructions, Relus "would be harmed materially" were Simple Helix "permitted to assert" any additional right to a $501,207 payment.  *Id.*  As Relus rightly urges, it should not "pay double . . . to compensate [Simple Helix] for its CEO's fraud." (Doc. 14-1 at 6).

As recounted previously, the Supreme Court of Alabama has long recognized the principle that "[w]herever one of two innocent persons must suffer by the act of a third, he who enabled such third person to occasion the loss must sustain it."  *Eppes v. Thompson*, 79 So. 611, 615 (Ala. 1918) (quoting *H.C. & W.B. Reynolds Co. v. Reynolds*, 67 So. 293, 296 (1914)).  Here, Simple Helix enabled Shickles's misconduct by appointing him CEO and failing to "discover[] [his] scheme."  (Doc. 1-1 ¶ 26).[34]  As the Supreme

---

must have in good faith been ignorant of the true facts at the time a representation is made to him, and must have acted with diligence to learn the truth.'") (quoting *Ivey v. Dixon Inv. Co.*, 219 So. 2d 639, 643 (Ala. 1969)).  Further, because Simple Helix concedes Shickles acted as its agent in demanding Relus refund the overpayment, Simple Helix does not plausibly suggest Relus should have taken the additional step of calling Simple Helix's primary investor to confirm Shickles's refund instructions.  *See* doc. 1-1 ¶ 15 ("[I]nstead of picking up the phone and calling [Simple Helix's primary investor], . . . [Relus] simply sought confirmation from the same Fake Email Account that requested the funds be sent to the Wells Fargo Account in the first place.").  That is, Simple Helix cannot at once acknowledge that Shickles retained the authority to demand the refund *and* maintain that Relus should have done more to ascertain Shickles's authority.  *See Malmberg v. Am. Honda Motor Co.*, 644 So. 2d 888, 891 (Ala. 1994) ("When one has reasonably and in good faith been led to believe, from the appearance of authority which a principal permitted his agent to exercise, that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency.") (quoting *Pearson v. Agric. Ins. Co.*, 25 So. 2d 164, 167 (Ala. 1946)); *Van Derveer v. Strickland Bros. Mach. Co.*, 81 So. 197, 197 (Ala. Civ. App. 1919) ("When a third party, in dealing with an agent, has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority, and in such case a party dealing with the agent in good faith, relying upon the apparent authority with which the principal has clothed the agent, in the exercise of reasonable prudence is protected by the law as to all contracts made by him with such agent within the scope of the apparent authority of such agent.").

[34] Simple Helix alleges that "had either Relus or Wells Fargo acted appropriately, Simple Helix would have discovered Shickles'[s] scheme and put an end to it in May of 2017."  (Doc. 1-1 ¶ 26).  However,

Court of the United States reasoned, "seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts trust and confidence in the deceiver should be a loser than a stranger." *Merchants' Bank v. State Bank*, 77 U.S. 604, 646 (1870); *accord Allen v. Maury*, 66 Ala. 10, 19 (1880). Accordingly, however understandable Simple Helix's desire to recover from Shickles's "ab[ility] to . . . to deceive and steal from [it]", (doc. 1-1 ¶ 26), Simple Helix – rather than Relus – should, in equity, bear the loss of Shickles's deceit.

In summary, Simple Helix does not plausibly allege Relus failed to discharge its contractual duty to refund the $501,207 overpayment. To the contrary, the Complaint establishes that Simple Helix – acting through Shickles – instructed Relus to furnish the $501,207 refund via wire transfer to the Wells Fargo account, and that Relus performed its promise to refund the overpayment precisely as instructed. The afore-cited agency and equity principles thus estop Simple Helix from denying the binding effect of Shickles's misrepresentations and Relus's $501,207 wire transfer. Accordingly, Simple Helix fails to state a claim upon which relief can be granted for an account stated or breach of contract.

Simple Helix lodges a passing request in its brief in opposition to Relus's Motion

---

absent any plausible allegations that Relus's or Wells Fargo's "actions and omissions" violated their legal obligations to Simple Helix, (*id.*), Simple Helix, "the author of the misfortune[,] shall not [it]self escape the consequences and cast the burden upon another." *Merchants' Bank v. State Bank*, 77 U.S. 604, 645 (1870).

to Dismiss: "to the extent the Court finds [additional allegations] necessary [vis-à-vis its breach-of-contract claim], Simple Helix requests permission to add such allegations to the Complaint." (Doc. 25 at 11). But that request "possessed no legal effect." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018). The Eleventh Circuit has repeatedly held that, "'[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.'" *Id.* (quoting *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (in turn quoting *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009))). Moreover, a plaintiff seeking to amend its complaint "must 'set forth the substance of the proposed amendment or attach a copy of the proposed amendment to its motion.'" *Newton*, 895 F.3d at 1277 (quoting *Cita Tr.*, 879 F.3d at 1157 (in turn quoting *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999))). Simple Helix took neither of those actions.

Therefore, if Simple Helix desires to proceed with its account stated/breach-of-contract claim against Relus pursuant to the standards discussed herein, then it must properly seek leave of court pursuant to Federal Rule of Civil Procedure 15. Simple Helix should be mindful of its obligations to pursue plausible claims in any putative amended complaint, including presenting well-pleaded averments portraying Relus's nonperformance of a contractual duty.

Pursuant to the foregoing discussion, the court grants Relus's motion to dismiss Simple Helix's account stated and breach-of-contract claims.

## CONCLUSION AND ORDER

As resolved, Simple Helix failed to state viable claims against Wells Fargo for violation of § 7-4A-207, conversion, and money had and received.  Therefore, the court **GRANTS** Wells Fargo's Motion to Dismiss, and **DISMISSES** all claims against Wells Fargo.

Further, for the reasons discussed herein, Simple Helix failed to state viable claims against Relus for conversion, money paid by mistake, money had and received, money due on an open account, money due on an account stated, and breach of contract.  Therefore, the court **GRANTS** Relus's Motion to Dismiss, and **DISMISSES** all claims against Relus.

Should Simple Helix desire to file an amended complaint, it must take appropriate action within seven (7) days of the entry date of this order.

**DONE** and **ORDERED** this 8th day of October, 2020.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE